UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN TOMLIN, | : | |
| Plaintiff | : | CIVIL ACTION NO. 1:24-628 |
| v. | : | (JUDGE MANNION) |
| SGT. SMOLKE, *et al.*, | : | |
| Defendants | : | |

## MEMORANDUM

Presently before the court in this prisoner civil rights case is defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

**I.   BACKGROUND**

Plaintiff, Shawn Tomlin, filed this case on April 11, 2024, asserting claims for violation of his Eighth and Fourteenth Amendment rights based on an incident in which Defendant Smolke and four John Doe defendants allegedly used excessive force against him. (Doc. 1). The case was initially assigned to United States District Judge Christopher C. Conner. On December 5, 2024, Judge Conner dismissed Tomlin's Fourteenth Amendment claims and allowed the case to proceed solely on the Eighth Amendment excessive force claim. (Docs. 14-15). The case was reassigned

to the undersigned on January 21, 2025, following Judge Conner's retirement from the court.

Fact discovery closed on April 30, 2025. (Doc. 17). On June 24, 2025, Tomlin filed a motion for leave to conduct limited discovery to identify the four John Doe defendants. (Doc. 19). Plaintiff additionally filed a motion to extend the discovery deadline to permit this discovery. (Doc. 20).

Defendant Smolke filed a motion for summary judgment on June 30, 2025, followed by a statement of material facts and a supporting brief on July 14, 2025. (Docs. 21-23). Tomlin filed another motion to conduct limited discovery on July 31, 2025, noting that he had identified three of the four defendants but needed to conduct more discovery to identify the final defendant. (Doc. 25). Tomlin additionally moved for leave to amend his complaint to provide the identities of the three identified John Doe defendants. (Doc. 26).

Tomlin opposed the motion for summary judgment and filed a response to Smolke's statement of material facts on July 31, 2025. (Docs. 27-28). Tomlin then filed a second motion for leave to amend his complaint on August 6, 2025, in which he noted that he has learned the identity of the final John Doe defendant and requests leave to amend the complaint to provide the defendant's identity. (Doc. 29). Tomlin filed a supplemental

2

declaration and supplemental exhibits in opposition to the motion for summary judgment on September 15, 2025. (Doc. 35). Smolke then filed a reply brief in support of the motion for summary judgment on September 23, 2025. (Doc. 36). The motion for summary judgment, motions for limited discovery, motion to extend the discovery deadline, and motions for leave to amend are pending and ripe for review.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 254 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323-24. The moving party can discharge that burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary

judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

### III.  MATERIAL FACTS[1]

Tomlin was an inmate in Frackville State Correctional Institution ("SCI-Frackville") at all relevant times. (Doc. 22 ¶6; Doc. 28 ¶1). On April 29, 2023, Tomlin approached another inmate and they exchanged a physical item, which officers later learned was narcotics. (Doc. 22 ¶7). Smolke approached Tomlin and ordered him to go to the counselor's office. (Doc. 22 ¶¶8-9). Tomlin attempted to hide the left side of his body from Smolke while reaching into his pocket. (*Id.* ¶10). Smolke ordered Tomlin to submit to a search, but

---

[1] Local Rule 56.1 requires a motion for summary judgment to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried" and requires that the party opposing a motion for summary judgment file a statement responding to the numbered paragraphs in the movant's statement of material facts, which "shall include references to the parts of the record" that support the nonmovant's opposition to the motion. M.D. Pa. L.R. 56.1. The facts in this section are derived from the parties' Rule 56.1 statements. (*See* Docs. 22, 28). Although Tomlin's statement of material facts does not directly respond to the factual assertions in Smolke's statement, the substance of the statement can easily be understood as a direct response to Smolke's statement and will be liberally construed as such. The court construes the facts in the light most favorable to Tomlin as the non-moving party, but where Tomlin has not contradicted a factual assertion in Smolke's statement, the court treats the assertion as undisputed and cites directly to Smolke's statement to support the fact.

Tomlin refused, instead requesting that the search be conducted in a private area. (*Id.* ¶11; Doc. 28 ¶¶2-3).[2] Smolke initiated physical contact to gain control of Tomlin's left arm. (Doc. 22 ¶12). Smolke used force to bring Tomlin to the ground. (*Id.* ¶13; Doc. 28 ¶4).[3] Smolke observed Tomlin placing an object in his mouth. (Doc. 22 ¶13). Smolke used some manner of physical force to place Tomlin in handcuffs. (Doc. 22 ¶14; Doc. 28 ¶¶5-6).[4]

Smolke attempted to escort Tomlin off the unit, but he resisted. (Doc. 22 ¶15). Smolke called for a restraint chair and placed Tomlin in it. (*Id.*; Doc. 28 ¶6). Smolke told Tomlin to spit the object out of his mouth and warned him that he would use force and tase him if he did not comply. (Doc. 22 ¶19). Smolke then repeatedly ordered Tomlin to spit the object out of his mouth

---

[2] Smolke asserts that Tomlin was noncompliant with a search and Tomlin asserts that he did not comply because he wanted the search to be conducted in a private area. The court construes this fact in the light most favorable to Tomlin as the non-movant.

[3] Smolke asserts that he "placed" Tomlin on the ground, while Tomlin asserts that Smolke "slammed" him to the ground. Although the parties' characterizations of the force differ, it is undisputed that Smolke used force to get Tomlin to the ground in some manner. Tomlin also asserts that he was rendered unconscious by the force, (*see* Doc. 28 ¶4), but he has not cited any evidence to establish this fact.

[4] The parties again provide differing characterizations of this force. Smolke asserts that he simply "placed Tomlin in handcuffs," (Doc. 22¶14), while Tomlin asserts that Smolke "had his knee on [Tomlin's] neck while applying pressure to his back" before handcuffing him, (Doc. 28 ¶¶5-6). It is undisputed, however, that Smolke used some manner of force to handcuff Tomlin.

and repeatedly tased him when he did not comply. (Doc. 22 ¶¶19-20; Doc. 28 ¶7).[5] After using the taser, Smolke and other officers who were present again ordered Tomlin to spit the object out of his mouth and then used "pressure point control techniques" to try to get Tomlin to comply. (Doc. 22 ¶¶20-21). Tomlin was taken to a body scanner where he was seen by registered nurse Stahler. (*Id.* ¶22). Tomlin continued to not comply with orders to spit the object out of his mouth and was uncooperative during the body scanner process. (*Id.* ¶¶23-24). Staff members gave Tomlin three doses of Narcan after observing that he was lethargic, drowsy, and slow to respond. (*Id.* ¶¶25-26). After the Narcan was administered, Tomlin became responsive, argumentative, and uncooperative with staff. (*Id.* ¶27). He was subsequently transported to a hospital. (*Id.* ¶28; Doc. 28 ¶9).[6]

After returning from the hospital, Tomlin did not complain about any physical pain. (Doc. 22 ¶29). He did not make any complaints of pain on the following day, but submitted an allegation that he was assaulted. (*Id.* ¶¶30-

---

[5] The parties dispute how many times a taser was used, with Smolke asserting that it was used four times and Tomlin asserting that it was used "more than six times." (Doc. 22 ¶20; Doc. 28 ¶7). But it is undisputed that Smolke tased Tomlin multiple times.

[6] The parties dispute why Tomlin was taken to a hospital. Smolke asserts that he was taken to a hospital due to a suspected drug overdose, while Tomlin asserts that he was taken to the hospital because of injuries he suffered from the use of force. (Doc. 22 ¶28; Doc. 28 ¶9).

7

31). His only reported injuries were superficial abrasions to his knee. (*Id.* ¶32). The object that was recovered from Tomlin's mouth subsequently tested positive for the presence of narcotics. (*Id.* ¶¶33-34).

Tomlin filed Grievance Number 1034251 on May 11, 2023, complaining of the use of excessive force. (Doc. 22-16 at 4-5). On May 18, 2023, the prison issued an initial level extension noting that it needed more time to respond to the grievance so that an investigation of the use of force could be completed. (*Id.* at 3). The prison then denied the grievance on July 5, 2023. (*Id.* at 2). Tomlin did not appeal the denial of the grievance through all stages of administrative review. (Doc. 22 ¶40).

## IV.   DISCUSSION

Tomlin's claims are filed pursuant to 42 U.S.C. §1983. Section 1983 authorizes redress for violations of constitutional rights and provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. §1983. Thus, to establish a successful claim under Section 1983, a plaintiff must demonstrate that the challenged conduct was committed by a person acting under color of state law and deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). By its terms, Section 1983 does not create a substantive right, but merely provides a method for vindicating federal rights conferred by the United States Constitution and the federal statutes that it describes. *Baker v. McCollan*, 443 U.S. 137 (1979).

At the outset, the court will grant Tomlin's motions for leave to amend to name the John Doe defendants. The court will accordingly direct the Clerk of Court to amend the caption of this case to reflect the actual identities of the John Doe defendants.[7] However, because these amendments do not alter any of the underlying facts or legal issues in the case, the court will

---

[7] Smolke argues that any claims against the John Doe defendants should be dismissed and the motions for leave to amend denied because they were not served with process within the timeline prescribed by Federal Rule of Civil Procedure 4(m). (Doc. 34 at 1 n.2). The court finds that this argument would be properly asserted in a motion to dismiss the claims after amendment was permitted rather than at this stage of litigation. Regardless of this issue, however, the court notes that summary judgment in favor of all defendants is warranted for Tomlin's failure to exhaust administrative remedies as discussed below. The service issue raised by defendant Smolke on behalf of the other defendants is accordingly moot.

proceed with its analysis of Smolke's motion for summary judgment. Additionally, because Tomlin's motions for leave to conduct additional discovery and motion to extend the discovery deadline only request additional discovery to learn the identities of the John Doe defendants, the court will deny those motions as moot.

Turning to the motion for summary judgment, the court will first address Smolke's argument that Tomlin failed to exhaust administrative remedies. Under the Prison Litigation Reform Act ("PLRA"), prisoners complaining about the conditions of their confinement must exhaust available administrative remedies before they may file suit in federal court. 42 U.S.C. §1997e(a). The PLRA requires proper exhaustion, meaning plaintiffs must administratively grieve their claims in accordance with the procedural rules of the prison in which they are incarcerated. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Failure to exhaust administrative remedies is an affirmative defense that defendants must plead and prove; it is not a pleading requirement for plaintiffs. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

A prisoner is only required to exhaust administrative remedies that are "available." *Rinaldi*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Woodford*, 548 U.S. at 93). An administrative remedy is unavailable, and administrative

exhaustion is thus excused, in three situations: "(1) when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) when it is 'so opaque that it becomes, practically speaking, incapable of use,' such as when no ordinary prisoner can discern or navigate it; or (3) when 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id.* at 266-67 (quoting *Ross v. Blake*, 578 U.S. 632, 643-44 (2016)). Once a defendant has established that the plaintiff failed to exhaust administrative remedies, the burden shifts to the plaintiff to show that the administrative process was unavailable to him. *Id.* at 268.

Exhaustion of administrative remedies in the DOC is governed by the three-step process outlined in the DOC's grievance policy, DC-ADM 804. (*See* DC-ADM 804, Doc. 22-14). Under DC-ADM 804, a prisoner must first submit a written grievance within fifteen working days from the date of the incident. *Id.* §1(A)(8). DC-ADM 804 provides that the grievance must include "a statement of the facts relevant to the claim," "identify individuals directly involved in the events," and "specifically state any claims [the inmate] wishes to make concerning violations of Department directives, regulations, court orders, or other law." *Id.* §1(A)(11). If the inmate is unable to comply with the

11

fifteen-day deadline, he may request an extension of time to file a grievance. *Id.* §1(C)(2).

If a grievance is determined to allege abuse of an inmate, it is investigated pursuant to DC-ADM 001. *Id.* §1(D)(3). Upon making this determination, the facility grievance coordinator must submit an extension giving notice of the investigation pursuant to DC-ADM 001 to the inmate. *Id.* §1(d)(4). The initial review response granting or denying the inmate's grievance is not issued until the investigation is complete. *Id.* §1(D)(5).

If an inmate's grievance is denied at the initial review level, the prisoner must submit a written appeal to an intermediate review level within fifteen working days. *Id.* §2(A)(1)(a). Finally, the inmate must submit an appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days. *Id.* §2(B)(1)(b).

Here, Smolke asserts that Tomlin failed to exhaust administrative remedies, and Tomlin argues to the contrary that exhaustion was excused because the prison failed to respond to his grievance within the timeline required by DC-ADM 804. (Doc. 23 at 3-5; Doc. 27 at 2-3; Doc. 35 at 1-2).

Tomlin is incorrect. The prison's initial response to his grievance was an initial level extension providing notice that his grievance would be investigated pursuant to DC-ADM 001. (Doc. 22-16). According to DC-ADM

12

804, once this initial level extension was issued, the initial review response granting or denying his grievance did not need to be issued until after the investigation was complete. *See* DC-ADM 804, §1(D)(5). The prison's July 5, 2023, initial review response denying the grievance complied with this rule. (*See* Doc. 22-16 at 2).

Tomlin's argument to the contrary appears to be based on a misreading of DC-ADM 804. Tomlin argues that the prison's issuance of an initial level extension extended the deadline for the prison to issue an initial review response "until June 8, 2023." (Doc. 35 at 2). This argument appears to be based on Section 1(C)(5)(h), which allows the prison to obtain a limited extension of time to issue an initial review response "if the investigation of the grievance is ongoing." DC-ADM 804 §1(C)(5)(h). The initial level extension, however, was issued pursuant to Section 1(D)(4), which provides the policy for when grievances are referred for investigation as allegations of abuse pursuant to DC-ADM 001. DC-ADM 804 §1(D)(4). Section 1(D) does not set a specific timeline for when an initial review response is due when a grievance has been referred for investigation pursuant to DC-ADM 001; it only states that the initial review response will not issue until the investigation is complete. *Id.* §1(d)(5). Although it may be possible to argue that the policy is ambiguous in light of Section 1(C)(5)(h)'s specific time limit on extensions,

13

Tomlin was required to err on the side of exhaustion when faced with a possible ambiguity in the language of the policy. *See Ross*, 578 U.S. at 644 ("When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion."). Thus, Tomlin should have erred on the side of exhaustion by appealing his grievance through all stages of administrative review. Because he failed to do so, Smolke is entitled to judgment for Tomlin's failure to exhaust administrative remedies.

The court will similarly grant summary judgment as to all other defendants in the case. Although Smolke is the only defendant who moved for summary judgment, the record clearly shows that all defendants are entitled to judgment in their favor for Tomlin's failure to exhaust administrative remedies, and Smolke's motion for summary judgment provided ample notice to Tomlin of the possibility that summary judgment could be granted to the other defendants. *See Couden v. Duffy*, 446 F.3d 483, 500 (3d Cir. 2006) (holding that district court may grant summary judgment to non-moving defendants where other defendant moved for summary judgment and the motion provided notice to plaintiff of the legal issues on which summary judgment was granted).

## V. CONCLUSION

For the foregoing reasons, the court will grant summary judgment in favor of all defendants and close this case. An appropriate order shall issue.

*s/ Malachy E. Mannion*
**Malachy E. Mannion**
**United States District Judge**

**Dated: December 8, 2025**
24-628-01